JONES DAY
Jayant W. Tambe
Laura Washington Sawyer
Benjamin Rosenblum
Matthew Chow
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
:
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.,* : Case No. 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
:
------------------------------------------------------------X
:
LEHMAN BROTHERS HOLDINGS INC., :
LEHMAN BROTHERS SPECIAL FINANCING :
INC., LEHMAN BROTHERS COMMODITY :
SERVICES INC. and LEHMAN BROTHERS :
COMMERCIAL CORP., :
:
Plaintiffs, :
:
-against- :
: Adv. Proc. No. 13-_____ (JMP)
CREDIT SUISSE, CREDIT SUISSE :
INTERNATIONAL, CREDIT SUISSE ENERGY :
LLC and CREDIT SUISSE SECURITIES :
(EUROPE) LTD., :
:
Defendants. :
:
------------------------------------------------------------X

**ADVERSARY COMPLAINT
AND OBJECTION TO CLAIMS**

Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS") and Lehman Brothers Commercial Corp. ("LBCC," and together with LBSF and LBCS, the "Lehman Subsidiaries"), and Lehman Brothers Holdings Inc. ("LBHI," and together with the Lehman Subsidiaries, "Lehman"), on behalf of itself and as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), as and for their Adversary Complaint and Objection to Claims against Credit Suisse ("CS Zurich"), Credit Suisse International ("CS International"), Credit Suisse Energy LLC ("CS Energy") and Credit Suisse Securities (Europe) Ltd. ("CS Europe") (collectively, "Credit Suisse"), hereby allege as follows:

## INTRODUCTION

1. Credit Suisse has filed 16 derivatives and guarantee claims (the "Credit Suisse Claims") that are among the largest unresolved claims of their kind in Lehman's chapter 11 cases. This action seeks to reduce, disallow or expunge the Credit Suisse Claims because they have been inflated by over $1 billion in violation of the Bankruptcy Code, the agreements governing the transactions at issue and/or applicable common law. In addition, this action seeks to recover over $150 million that Credit Suisse owes Lehman for the benefit of Lehman's estates and its creditors.

2. Credit Suisse has long been one of the largest derivatives dealers in the world, routinely effecting large volumes of all types of complex derivatives contracts. At the time of Lehman's bankruptcy, Credit Suisse had tens of thousands of outstanding derivatives transactions with the Lehman Subsidiaries. Credit Suisse terminated all of those transactions on September 15, 2008, immediately following Lehman's bankruptcy filing. The Bankruptcy Code, the applicable contracts and common law required Credit Suisse to value the terminated transactions as of the termination date in good faith and in a commercially reasonable manner.

3.  Credit Suisse did not abide by its obligations under the Bankruptcy Code, governing contracts or applicable law.  Instead, Credit Suisse deliberately constructed bankruptcy claims designed to impose upon Lehman hundreds of millions of dollars in costs and charges that Credit Suisse did not actually incur and which did not reasonably, or in good faith, reflect the actual value of the terminated transactions.

**PARTIES**

4.  LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estates and interpose and prosecute objections to claims against the estates.

5.  LBSF is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  On October 3, 2008, LBSF commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6.  LBCS is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  On October 3, 2008, LBCS commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  LBCS's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

7. LBCC is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On October 5, 2008, LBCC commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. LBCC's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

8. CS Zurich is a global financial services company, and upon information and belief, it is organized under the laws of Switzerland, and its office is located at Uetlibergstrasse 231, CH-8070 Zurich, Switzerland.

9. CS International is a global financial services company organized under the laws of the United Kingdom and regulated by the U.K. Prudential Regulation Authority and U.K. Financial Conduct Authority. Upon information and belief, its office is located at 1 Cabot Square, London, E 14 4QJ, United Kingdom.

10. CS Energy is a limited liability company incorporated under the laws of the State of Delaware. Its office is located at 11 Madison Avenue, New York, New York 10010.

11. CS Europe is a securities dealer organized under the laws of the United Kingdom and regulated by the U.K. Prudential Regulation Authority and U.K. Financial Conduct Authority. Upon information and belief, its office is located at 1 Cabot Square, London, E 14 4QJ, United Kingdom.

**JURISDICTION AND VENUE**

12. Plaintiffs bring this adversary proceeding pursuant to Rules 3007, 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), as well as sections 105(a), 502 and 541 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and applicable provisions of state law.

13. The Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court has retained jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraphs RR and 77 of the Order confirming the Plan. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

14. Venue is proper in the Court pursuant to 28 U.S.C. § 1409 because LBHI's bankruptcy case is pending in this district.

## FACTUAL ALLEGATIONS

### A. The Claims and Derivatives at Issue

15. The Credit Suisse Claims arise out of tens of thousands of derivatives transactions (the "Credit Suisse Derivatives"), each governed by one of eight 1992 ISDA Master Agreements (together with their respective schedules, definitions, confirmations and credit support annexes, and as amended, the "Derivatives Agreements"). Each Derivatives Agreement was entered into by and between a Credit Suisse entity and one of the Lehman Subsidiaries.

16. All of the Derivatives Agreements were amended pursuant to the Close-out Amount Multilateral Agreement (the "MLA"), entered into on August 29, 2008, by and between other major banks, Credit Suisse and the Lehman Subsidiaries. The MLA amended the provisions of the Derivatives Agreements governing the determination of amounts payable with respect to the Credit Suisse Derivatives upon early termination.

17. LBHI is the purported guarantor of the Lehman Subsidiaries' obligations and a "Credit Support Provider" under the Derivatives Agreements.

- 5 -

18. The Derivatives Agreements and their related proofs of claim are summarized in the table below.

| | Agreement and Date | Lehman Subsidiary | Credit Suisse Entity | Proof of Claim No. |
|---|---|---|---|---|
| 1. | "LBSF-CS International Agreement," dated as of Sept. 12, 2008 | LBSF | CS International | Derivative 22843 Guarantee 22813 |
| 2. | "LBSF-CS Zurich Agreement," dated as of Aug. 20, 2004 | LBSF | CS Zurich | Derivative 22854 Guarantee 22852 |
| 3. | "LBCS-CS Energy Agreement," dated as of May 17, 2006 | LBCS | CS Energy | Derivative 22828 Guarantee 22815 |
| 4. | "LBCC-CS Zurich Agreement," dated as of Aug. 20, 2004 | LBCC | CS Zurich | Derivative 22853 Guarantee 22841 |
| 5. | "LBSF-CS Europe Agreement," dated as of June 6, 1997 | LBSF | CS Europe | Derivative 22856 Guarantee 22848 |
| 6. | "LBCC-CS Europe Agreement," dated as of Sept. 28, 1998 | LBCC | CS Europe | Derivative 22849 Guarantee 22847 |
| 7. | "LBCC-CS International Agreement," dated as of Dec. 18, 1995 | LBCC | CS International | Derivative 22842 Guarantee 22812 |
| 8. | "LBCS-CS International Agreement," dated as of Mar. 23, 2008 | LBCS | CS International | Derivative 22821 Guarantee 22820 |

19.     Each of the Derivatives Agreements and their respective Transactions[1] were terminated as of September 15, 2008, on the basis of LBHI filing its voluntary petition for bankruptcy in this Court.

20.     All of the Derivatives Agreements, as amended by the MLA, required Credit Suisse to calculate the "Close-out Amount" following the termination of the Derivatives Agreements.  The definition of Close-out Amount includes specific requirements for the determination of amounts due upon early termination, including (i) good faith, (ii) commercially reasonable procedures, (iii) commercially reasonable results, (iv) a determination of the Close-out Amount "as of" the Early Termination Date or, if that would not be commercially reasonable, as of the earliest date or dates following the Early Termination Date as would be commercially reasonable, and (v) entitlement only to the "economic equivalent" of the terminated Transactions, not a windfall.

### B.     Credit Suisse Anticipated LBHI's Bankruptcy

21.     At 6:53 p.m. on Sunday, September 14, 2008 – several hours before LBHI filed its petition in this Court – a Credit Suisse employee prepared a draft notice of early termination of all Transactions under the LBCC-CS Europe Agreement.  The draft stated: "It has come to CS's attention that Lehman Brothers Holdings Inc. has filed a petition for relief under the United States Bankruptcy Code on September __, 2008."  The draft was complete except for placeholders for the date of the letter, the date of LBHI's bankruptcy petition, and the date that Credit Suisse would eventually designate as the Early Termination Date for the Transactions:

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the respective Derivatives Agreements.

"September __, 2008."

22. Upon information and belief, Credit Suisse also drafted notices of early termination of all other Transactions now at issue, before LBHI actually filed for bankruptcy.

23. In addition, upon information and belief, Credit Suisse printed and prepared the draft notices of early termination for delivery, before LBHI actually filed for bankruptcy.

24. At 1:45 a.m. on Monday, September 15, 2008, LBHI filed for bankruptcy.

25. After LBHI filed for bankruptcy, Credit Suisse employees completed the pre-printed notices of early termination dated "September __, 2008," by inserting the number "15" by hand. Credit Suisse sent the notices to Lehman later that same day, September 15, 2008.

### C. The Credit Suisse Claims

26. Altogether, the Credit Suisse Claims seek $1,188,525,210 from the Lehman estates. As discussed further below, the Credit Suisse Claims must be reduced, disallowed and/or expunged for a number of reasons, including Credit Suisse's failure to (i) exercise good faith, (ii) use commercially reasonable procedures, (iii) produce a commercially reasonable result, (iv) determine Close-out Amount "as of" the Early Termination Date and (v) seek to recover only the "economic equivalent" of the Terminated Transactions, in determining Close-out Amount with respect to the Terminated Transactions.

#### i. The LBSF-CS International Claim

27. On September 15, 2008, CS International terminated all of the transactions under the LBSF-CS International Agreement.

28. On September 21, 2009, CS International filed proof of claim number 22843 against LBSF and proof of claim number 22813 against LBHI for, among other things, amounts allegedly due to CS International under the LBSF-CS International Agreement (collectively, the

"<u>LBSF-CS International Claim</u>").  According to CS International, the amount of the LBSF-CS International Claim is $932,898,750.38.

29.     For the reasons set forth in this Adversary Complaint and Claim Objection, the LBSF-CS International Claim is overstated.  Based upon LBSF's calculation, the LBSF-CS International Claim should be disallowed and expunged in its entirety, and the close-out of the LBSF-CS International Agreement should result in a payment of at least $150,000,000 to LBSF.

### ii.     The LBSF-CS Zurich Claim

30.     On September 15, 2008, CS Zurich terminated all of the transactions under the LBSF-CS Zurich Agreement.

31.     On September 21, 2009, CS Zurich filed proof of claim number 22854 against LBSF and proof of claim number 22852 against LBHI for, among other things, amounts allegedly due to CS Zurich under the LBSF-CS Zurich Agreement (collectively, the "<u>LBSF-CS Zurich Claim</u>").  According to CS Zurich, the amount of the LBSF-CS Zurich Claim is $138,712,743.90.

32.     For the reasons set forth in this Adversary Complaint and Claim Objection, the LBSF-CS Zurich Claim is overstated.  Based upon LBSF's calculation, the LBSF-CS Zurich Claim should be reduced to approximately $40,500,000.

### iii.    The LBCS-CS Energy Claim

33.     On September 15, 2008, CS Energy terminated all of the transactions under the LBCS-CS Energy Agreement.

34.     On September 21, 2009, CS Energy filed proof of claim number 22828 against LBCS and proof of claim number 22815 against LBHI for, among other things, amounts allegedly due to CS Energy under the LBCS-CS Energy Agreement (collectively, the "<u>LBCS-CS

Energy Claim"). According to CS Energy, the amount of the LBCS-CS Energy Claim is $71,622,924.27.

35. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBCS-CS Energy Claim is overstated. Based upon LBCS's calculation, the LBCS-CS Energy Claim should be reduced to approximately $20,000,000.

### iv. The LBCC-CS Zurich Claim

36. On September 15, 2008, CS Zurich terminated all of the transactions under the LBCC-CS Zurich Agreement.

37. On September 21, 2009, CS Zurich filed proof of claim number 22853 against LBCC and proof of claim number 22841 against LBHI for, among other things, amounts allegedly due to CS Zurich under the LBCC-CS Zurich Agreement (collectively, the "LBCC-CS Zurich Claim"). According to CS Zurich, the amount of the LBCC-CS Zurich Claim is $21,822,749.28.

38. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBCC-CS Zurich Claim is overstated. Based upon LBCC's calculation, the LBCC-CS Zurich Claim should be reduced to approximately $6,400,000.

### v. The LBSF-CS Europe Claim

39. On September 15, 2008, CS Europe terminated all of the transactions under the LBSF-CS Europe Agreement.

40. On September 21, 2009, CS Europe filed proof of claim number 22856 against LBSF and proof of claim number 22848 against LBHI for, among other things, amounts allegedly due to CS Europe under the LBSF-CS Europe Agreement (collectively, the "LBSF-CS

- 10 -

Europe Claim"). According to CS Europe, the amount of the LBSF-CS Europe Claim is $9,657,351.37.

41. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBSF-CS Europe Claim is overstated. Based upon LBSF's calculation, the LBSF-CS Europe Claim should be reduced to approximately $2,300,000.

### vi. The LBCC-CS Europe Claim

42. On September 15, 2008, CS Europe terminated all of the transactions under the LBCC-CS Europe Agreement.

43. On September 21, 2009, CS Europe filed proof of claim number 22849 against LBCC and proof of claim number 22847 against LBHI for, among other things, amounts allegedly due to CS Europe under the LBCC-CS Europe Agreement (collectively, the "LBCC-CS Europe Claim"). According to CS Europe, the amount of the LBCC-CS Europe Claim is $6,870,421.00.

44. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBCC-CS Europe Claim is overstated. Based upon LBCC's calculation, the LBCC-CS Europe Claim should be reduced to approximately $5,100,000.

### vii. The LBCC-CS International Claim

45. On September 15, 2008, CS International terminated all of the transactions under the LBCC-CS International Agreement.

46. On September 21, 2009, CS International filed proof of claim number 22842 against LBCC and proof of claim number 22812 against LBHI for, among other things, amounts allegedly due to CS International under the LBCC-CS International Agreement (collectively, the

- 11 -

"LBCC-CS International Claim"). According to CS International, the amount of the LBCC-CS International Claim is $6,720,736.76.

47. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBCC-CS International Claim is overstated. Based upon LBCC's calculation, the LBCC-CS International Claim should be reduced to approximately $268,000.

### viii. The LBCS-CS International Claim

48. On September 15, 2008, CS International terminated all of the transactions under the LBCS-CS International Agreement.

49. On September 21, 2009, CS International filed proof of claim number 22821 against LBCS and proof of claim number 22820 against LBHI for, among other things, amounts allegedly due to CS International under the LBCS-CS International Agreement (collectively, the "LBCS-CS International Claim"). According to CS International, the amount of the LBCS-CS International Claim is $219,534.00.

50. For the reasons set forth in this Adversary Complaint and Claim Objection, the LBCS-CS International Claim is overstated. Based upon LBCS's calculation, the LBCS-CS International Claim should be disallowed and expunged in its entirety, and the close-out of the LBCS-CS International Agreement should result in a payment of at least $390,000 to LBCS.

### D. Credit Suisse Has Prevented a Fair Assessment of the Credit Suisse Claims

51. Credit Suisse has asserted claims for losses and costs allegedly sustained by Credit Suisse arising from the early termination of the derivatives transactions. Evaluation of these types of claims by Lehman's largest financial institution counterparties – for each of which there are tens of thousands of underlying transactions – is document intensive and requires a detailed review of among other things (i) documentation identifying each of the tens of thousands of derivatives transactions at issue; (ii) backup files expressly referenced in the Credit

Suisse Claims but not produced; (iii) additional components embedded in the Credit Suisse Claims; (iv) native spreadsheets for certain files; (v) legible screenshots; (vi) related replacement or hedging transactions; (vii) intra-day and closing risk reports with respect to the derivatives at issue; (viii) how Credit Suisse accounted for its purported losses and costs in its representations to the public and to regulators; (ix) how Credit Suisse's valuations of the derivatives at issue deviated in methodology from its valuations of other similar derivatives; and (x) calculations of the losses and costs incurred by Credit Suisse.

52. The Credit Suisse Claims do not include documentation that enables Lehman to conduct the required detailed review necessary to evaluate the claims. On multiple occasions since Credit Suisse submitted its responses to the Derivatives Questionnaire in October 2009, Lehman has contacted Credit Suisse and requested specific documentation and information to assist it in understanding and evaluating the Credit Suisse Claims. Credit Suisse has failed to comply with those requests.

53. Credit Suisse, through its counsel, has promised to "continue to supplement [its] response based on additional information that may become available during the course of their review," but little such additional information has been provided. The most recent such promise was made to Lehman over seven months ago, and it is now over four years since Credit Suisse filed its proofs of claim.

54. In the absence of the requested documentation and information, Lehman has been unable to calculate the precise amount by which the Credit Suisse Claims have been inflated. But, based upon its own valuations made in accordance with the requirements of the Bankruptcy Code, the governing contracts and applicable law, Lehman believes that the Credit Suisse Claims must be substantially reduced, disallowed and/or expunged.

### E. The Credit Suisse Claims Must Be Substantially Reduced, Disallowed and/or Expunged Because They Are Contrary to the Requirements of the Bankruptcy Code, Derivatives Agreements and Applicable Law

55.     Credit Suisse seeks, in the aggregate, nearly $1.2 billion from the Lehman estates. But based on Lehman's books and records, and the limited information provided by Credit Suisse, a proper close-out determination of the Credit Suisse Derivatives results in (i) a substantial overall reduction of the Credit Suisse Claims to just $75 million, and (ii) a receivable to the Lehman estates of approximately $150 million with regard to the Transactions under the LBSF-CS International Agreement and the LBCS-CS International Agreement.

56.     To engineer the exaggerated amounts it claims, Credit Suisse violated the Bankruptcy Code, the Derivatives Agreements and applicable law.  By way of example, Credit Suisse failed to offset counterbalancing positions, opportunistically selected favorable valuation dates and times, and valued its positions inconsistently to its own advantage, all without adequate – or any – justification.

57.     Under the provisions of the ISDA Master Agreements pursuant to which these derivatives transactions were entered, the Bankruptcy Code and common law, the party making the calculation of amounts owing upon early termination is required, except in limited circumstances, to make such calculations as of the early termination date.

58.     In a similar vein, section 562 of the Bankruptcy Code sets forth the rule that damages for swap agreements are generally measured as of the earlier of either: (a) the date of termination, liquidation, or acceleration of the contract; or (b) the date of the rejection of the contract, pursuant to section 365 of the Bankruptcy Code.  11 U.S.C. § 562(a).  Only if "there are not any commercially reasonable determinants of value" as of the termination, liquidation or acceleration may damages be measured as of the earliest subsequent date or dates on which commercially reasonable determinants exist.  11 U.S.C. § 562(b).  The party opposing

- 14 -

application of the general rule bears the burden of proving there were no "commercially reasonable determinants of value" on the date or dates of termination, liquidation or acceleration. *See* 11 U.S.C. § 562(c).

59. As applied to the Terminated Transactions, section 562 requires damages to be measured as of the date of the termination of the Transactions, *i.e.*, September 15, 2008. Credit Suisse has disregarded section 562 in calculating the amounts allegedly due from Lehman under the Derivatives Agreements. For thousands of the Transactions at issue, Credit Suisse has failed to specify the date as of which it valued them. Based on the limited documentation provided by Credit Suisse, however, it is clear that Credit Suisse has valued at least 14,000 Transactions as of dates other than September 15, 2008.

60. In addition, the Derivatives Agreements expressly require Credit Suisse to calculate its claims by valuing the Credit Suisse Derivatives as of the Early Termination Date designated by Credit Suisse: September 15, 2008. Commercially reasonable determinants of value existed as of September 15, 2008, and it was reasonably practicable to determine total losses and costs as of that date. By failing to value the Terminated Transactions "as of" September 15, 2008, Credit Suisse has breached (i) the express contractual requirement to do so, as set forth in the definitions of Close-out Amount and (ii) the express contractual requirements of good faith and commercial reasonableness.

61. Furthermore, the Derivatives Agreements and applicable common law only permit Credit Suisse to receive the "economic equivalent" of the Credit Suisse Derivatives. For thousands of the Transactions at issue, Credit Suisse has failed to provide sufficient information to assess whether Credit Suisse has in fact sought only the economic equivalent, or more. But for thousands of other Transactions, based on the limited documentation provided by Credit

Suisse, Credit Suisse has included in the Credit Suisse Claims hypothetical losses that it never incurred or would have ever incurred. By seeking more than the "economic equivalent" of the Terminated Transactions, Credit Suisse has breached (i) the express contractual requirement limiting its purported losses to the "economic equivalent" of the Terminated Transactions, as set forth in the definition of Close-out Amount and (ii) the express contractual requirements of good faith and commercial reasonableness.

62. By violating the Bankruptcy Code, the Derivatives Agreements and applicable law to construct its exaggerated claim amounts, Credit Suisse seeks to harm the Lehman estates and disadvantage all of its legitimate creditors.

63. The validity of the Credit Suisse Claims also is belied by Credit Suisse's own internal risk management practice of managing its derivatives on a portfolio basis. For example, instead of applying portfolio aggregation to determine the economic equivalent of the material terms of the Transactions as a group – as any reasonable trader or risk manager would do, as Credit Suisse customarily did, and as commercial reasonableness requires – Credit Suisse conducted its close out calculations for the majority of the trades on a gross, or isolated, basis. This procedure was not commercially reasonable, not done in good faith and greatly inflated the amount of losses claimed by Credit Suisse.

64. In addition, Credit Suisse elected not to offset Transactions – or to the extent it did offset Transactions, it did so incompletely – so as to inflate the close out calculations by adding improper charges on individual Transactions. This is despite the fact that Credit Suisse did not actually incur, nor would it ever have incurred, those charges. Credit Suisse's decision not to net risk positions was not in good faith, was not commercially reasonable, did not produce a commercially reasonable result and greatly inflated the amounts claimed by Credit Suisse.

65. Credit Suisse did not actually suffer $1.2 billion in losses it now seeks from the Lehman estates. The amount sought by the Credit Suisse Claims is contradicted by Credit Suisse's repeated public representations and statements to its investors about its derivatives trading prowess, its risk management skills and the impact of the Lehman bankruptcy on Credit Suisse's business.

## FIRST CAUSE OF ACTION
### (Objection to Claims – No Liability)

66. Plaintiffs incorporate the foregoing paragraphs as if fully stated herein.

67. The Credit Suisse Claims arising out of the (i) LBSF-CS International Agreement and (ii) LBCS-CS International Agreement, are not valid claims against Lehman because the calculation of such claims was not done in good faith, was not done using commercially reasonable procedures, did not produce a commercially reasonable result and resulted in claim amounts far in excess of the economic equivalent of the Transactions. As described above, Credit Suisse failed to value the Transactions "as of" September 15, 2008, improperly charged add-ons and failed to offset counterbalancing positions.

68. Plaintiffs hereby object to the Credit Suisse Claims arising out of the (i) LBSF-CS International Agreement and (ii) LBCS-CS International Agreement, on the basis that Lehman is not liable to Credit Suisse pursuant to the Bankruptcy Code, the Derivatives Agreements and applicable common law.

## SECOND CAUSE OF ACTION
### (Breach of the LBSF-CS International Agreement)

69. Plaintiffs incorporate the foregoing paragraphs as if fully stated herein.

70. LBSF adequately performed its obligations under the LBSF-CS International Agreement.

71. CS International breached the LBSF-CS International Agreement by calculating the Close-out Amount under the LBSF-CS International Agreement in bad faith and in a manner that was commercially unreasonable, produced a commercially unreasonable result and wholly unrelated to CS International's actual economic damages.

72. Under the LBSF-CS International Agreement, CS International was required to pay LBSF for any gains it enjoyed as a result of termination. A proper determination of the Close-out Amount under the LBSF-CS International Agreement would have resulted in a net payment to LBSF in the amount of $151,933,338. Instead, CS International calculated a Close-out Amount under the LBSF-CS International Agreement resulting in a net claim in favor of CS International in the amount of $932,898,750.

235. As a direct and proximate result of CS International's breach of the LBSF-CS International Agreement, LBSF has suffered damages of at least $150,000,000.

### THIRD CAUSE OF ACTION
**(Breach of the LBCS-CS International Agreement)**

73. Plaintiffs incorporate the foregoing paragraphs as if fully stated herein.

74. LBCS adequately performed its obligations under the LBSF-CS International Agreement.

75. CS International breached the LBCS-CS International Agreement by calculating the Close-out Amount under the LBCS-CS International Agreement in bad faith and in a manner that was commercially unreasonable, produced a commercially unreasonable result and wholly unrelated to CS International's actual economic damages.

76. Under the LBCS-CS International Agreement, CS International was required to pay LBCS for any gains it enjoyed as a result of termination. A proper determination of the Close-out Amount under the LBCS-CS International Agreement would have resulted in a net

payment to LBCS in the amount of $390,901.  Instead, CS International calculated a Close-out Amount under the LBCS-CS International Agreement resulting in a net claim in favor of CS International in the amount of $219,534.

77.     As a direct and proximate result of CS International's breach of the LBCS-CS International Agreement, LBCS has suffered damages of at least $390,000.

### FOURTH CAUSE OF ACTION
### (Objection to Claims – Contrary to Debtors' Books and Records)

78.     Plaintiffs incorporate the foregoing paragraphs as if fully stated herein.

79.     The Credit Suisse Claims arising out of the (i) LBSF-CS Zurich Agreement, (ii) LBCS-CS Energy Agreement, (iii) LBCC-CS Zurich Agreement, (iv) LBSF-CS Europe Agreement, (v) LBCC-CS Europe Agreement and (vi) LBCC-CS International Agreement, are not valid claims against Lehman because the calculation of such claims was not done in good faith, was not done using commercially reasonable procedures, did not produce a commercially reasonable result, and resulted in claim amounts far in excess of the economic equivalent of the Transactions.  As described above, Credit Suisse, *inter alia*, failed to value the Transactions "as of" September 15, 2008, improperly charged add-ons and failed to net Transactions.

80.     Plaintiffs hereby object to the Credit Suisse Claims on the basis that the amounts sought contradict Lehman's books and records.

81.     Pursuant to the Bankruptcy Code, Derivatives Agreements and applicable common law, the amount of the claims should be reduced as follows: (i) the LBSF-CS Zurich Claim should be reduced to approximately $40,500,000, (ii) the LBCS-CS Energy Claim should be reduced to approximately $20,000,000, (iii) LBCC-CS Zurich Claim should be reduced to approximately $6,400,000, (iv) the LBSF-CS Europe Claim should be reduced to approximately

$2,300,000, (v) the LBCC-CS Europe Claim should be reduced to approximately $5,100,000 and (vi) the LBCC-CS International Claim should be reduced to approximately $268,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment:

(1) Sustaining Plaintiffs' objections to the CS Claims, and disallowing and expunging, or in the alternative reducing, such claims as set forth herein;

(2) Determining that Credit Suisse breached the Derivatives Agreements and owe Plaintiffs damages in the amounts set forth herein;

(3) Awarding interest in an amount to be determined at trial;

(4) Awarding costs and fees in an amount to be determined at trial; and

(5) Awarding such further relief as the Court deems just and proper.

Dated: November 6, 2013
New York, New York

Respectfully submitted,

JONES DAY

*/s/ Jayant W. Tambe*
Jayant W. Tambe
Laura Washington Sawyer
Benjamin Rosenblum
Matthew Chow
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Plaintiffs*